The undersigned have reviewed the Award based upon the record of the proceedings before the Deputy Commissioner.
The appealing party has shown good grounds to reconsider the evidence. However, upon reconsideration of the evidence, the undersigned reach the same facts and conclusions as those reached by the Deputy Commissioner with some minor modifications. Neither party here requested the Full Commission to receive further evidence or to rehear the parties or their representatives. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate award.
Accordingly, the Full Commission find as fact and conclude as matters of law the following, which were entered into by the parties as
STIPULATIONS
1. As aforementioned, all stipulations contained in the Pre-Trial Agreement are contained herein by reference.
2. The parties stipulated to, and the following documents were admitted into evidence:
 (a) Prehearing Interrogatories to the plaintiff marked as Stipulated Exhibit Number 1 (fifteen pages).
 (b) Employment Security Records marked as Stipulated Exhibit Number 2 (twenty-two pages).
 (c) Medical records from East Chatham Nursing Center, Inc. marked as Stipulated Exhibit Number 3 (seven pages).
 (d) Medical records from Chapel Hill Radiology marked as Stipulated Exhibit Number 4 (three pages).
 (e) Medical records from The Family Doctor marked as Stipulated Exhibit Number 5 (six pages).
 (f) Medical records from Chatham Family Physicians marked as Stipulated Exhibit Number 6 (twenty-five pages).
 (g) A Form 22 marked as Stipulated Exhibit Number 7 (two pages).
3. Subsequent to the initial hearing the parties submitted the medical records of Dr. Bruch, and those records were received into evidence and marked as Stipulated Exhibit Number 8 (five pages).
* * * * * * * * * * *
The Full Commission adopt as their own all findings of fact found by the Deputy Commissioner, with minor technical modifications, as follows:
Based upon the competent and convincing evidence adduced at the hearing, the undersigned make the following additional
FINDINGS OF FACT
1. At the time of the initial hearing, plaintiff was a fifty-nine (59) year old male who had been extensively trained as a plant engineer. The plaintiff had been employed by the defendant-employer as a maintenance security guard. Plaintiff's regular job duties included patrolling the campus, making rounds in a vehicle, doing minor repair work, noticing anything out of the ordinary that happened on campus, reporting it to his supervisors or handling it, and answering the emergency call system for residents.
2. On January 18, 1994, plaintiff suffered an injury by accident when he slipped and fell on some ice at work injuring his right knee and slightly cutting his right hand. The accident was admitted as compensable by the defendant-employer.
3. The defendant-employer authorized the plaintiff to be treated by physicians at The Family Doctor located in Chapel Hill. Plaintiff honestly misunderstood these instructions to mean that he was to go to the family doctor that he sees as his personal physician. Plaintiff went to East Chatham Medical Center, Inc. on the same day as the injury by accident where he was treated by Dr. Tyler. Subsequent to this treatment, plaintiff learned that the defendant-employer meant for plaintiff to be treated by The Family Doctor in Chapel Hill. On January 21, 1994, plaintiff went to The Family Doctor. Plaintiff was excused from working for one (1) week, and plaintiff was instructed to see his family physician Dr. Tyler for any further treatment.
4. Stan Shreve, physical plant director for the defendant-employer, notified plaintiff by letter dated February 1, 1994 that he was expected to return to work on February 5, 1994 in order to manage the responsibility of the reception area, telephone and computer system. Mr. Shreve never communicated to the plaintiff that he was restricted to only performing those duties. Mr. Shreve testified that the management reception area was not a separate job, but was in fact a duty to be shared with a co-worker in performing the overall duties of the maintenance security position. (See Defendants' Exhibit Number 2).
5. Plaintiff had the following restrictions placed upon him by his medical caretaker at Chatham Family Physicians at the time that he returned to work:
(a) Remain off leg as much as possible.
 (b) no ambulation or standing for greater than twenty (20) minutes at a time.
 (c) Rest with leg elevated (ankle to be higher than knee and knee to be higher than hip).
(d) Wear knee split at all times.
 (e) Alternate heat and ice to the knee four (4) times a day.
(f) No bending, stooping or kneeling.
6. On February 5, 1994, plaintiff returned to work. Plaintiff worked under the immediate supervision of Perry Dunn, the plant supervisor for the defendant-employer. Perry Dunn never communicated to the plaintiff that he was restricted to only perform the duty of managing the reception area, telephones and computer systems prior to February 21, 1994.
7. On February 12, 1994, the plaintiff left his post to retrieve a dog at the request of a resident. Plaintiff did not violate any work restrictions that had been communicated to plaintiff by defendant-employer or his medical caretakers in assisting the resident in the return of her dog.
8. On February 14, 1994, plaintiff returned to Chatham Family Physicians for further medical treatment for his right knee pursuant to the instructions by the physician at The Family Doctor.
9. In a letter dated February 17, 1994, William Maynard, director of personnel for the defendant-employer, informed plaintiff's nurse at Chatham Family Physicians that he intended to direct the workers' compensation carrier to stop reimbursement for treatment by Chatham Family Physicians because such treatment was unauthorized. Mr. Maynard was unaware of the instructions specifically given to plaintiff by the physician at The Family Doctor at the time that he made this decision.
10. On February 20, 1994, plaintiff left his post to assist an elderly resident in his bathroom. Plaintiff did not violate any work restrictions that had been communicated to plaintiff by the defendant-employer or his medical caretakers in assisting the elderly patient. Also on February 20, 1994, plaintiff left his post to escort some skateboarders off of Carolina Meadow's property. Plaintiff did not violate any work restrictions that had been communicated to plaintiff by defendant-employer or his medical caretakers in escorting these persons off of the premises.
11. On February 21, 1994, Perry Dunn gave written notice to the plaintiff that the plaintiff had failed to follow the direct order of his physician and supervisor when he left his post to retrieve a dog. Mr. Dunn asked the plaintiff to back date the written notice form to February 19, 1994 and the plaintiff agreed to do so. This notice was the first written notice of any alleged violations of company policy given to the plaintiff. On February 21, 1994, Perry Dunn gave written notice to the plaintiff that plaintiff had failed a direct order from the personnel director to go to the company physician for evaluation for his on the job injury. Mr. Dunn asked the plaintiff to back date the written notice form to February 19, 1994 and the plaintiff agreed to do so. This notice was the second written notice of any alleged violation of company policy.
12. After the plaintiff returned to work on February 5, 1994 and prior to his termination on February 22, 1994, plaintiff overheard William Maynard, director of personnel, communicate to Stan Shreve that "we don't need an old man sitting in here; we could get someone cheaper." This statement was uncontroverted and undenied.
13. On February 22, 1994, William Maynard, director of personnel, terminated the plaintiff for failure to remain on light duty by leaving his post twice on February 20, 1994. Mr. Maynard was under the mistaken belief that plaintiff had been given the two (2) written notices by Perry Dunn prior to February 20, 1994. Also, Mr. Maynard was under the mistaken belief that Stan Shreve and Perry Dunn had communicated to the plaintiff that he was not to leave his post.
14. Plaintiff's termination was not the result of any misconduct by the plaintiff.
15. On February 28, 1994, plaintiff reached maximum medical improvement for his compensable injury arising out of his accident. (See Stipulated Exhibit Number 6; a letter from Cynthia Humphrey to Mr. Maynard dated February 21, 1994).
16. Plaintiff began to search for work and applied at over sixteen (16) different employers in person. Plaintiff made a reasonable effort to obtain work. On June 9, 1994, plaintiff found a part-time job as a security guard working between sixteen (16) and twenty-four (24) hours per week at $5.00 per hour. Plaintiff averaged twenty-four (24) hours a week for a post-injury average weekly wage of $100.00.
17. Plaintiff received $192.00 per week in unemployment benefits subsequent to his termination on February 22, 1994. The effective beginning date for the receipt of these benefits was February 20, 1994, and plaintiff received benefits up until at least December 1, 1994.
18. As a result of plaintiff's compensable injury on January 18, 1994. plaintiff has suffered a fifteen percent (15%) permanent partial disability to his right knee. The undersigned afford greater weight to the opinion of Dr. Tyler than to Dr. Bruch. The plaintiff's physician worked closely with plaintiff and saw plaintiff's right knee progression for a long period of time whereas Dr. Bruch only saw the plaintiff on one (1) occasion.
19. Plaintiff will have future medical expenses for either over the counter medications or prescription anti-inflammatory medication such as Cataflam.
20. Plaintiff's average weekly wage at the time of his injury was $420.77.
21. Plaintiff is a credible and convincing witness as to his account of events.
* * * * * * * * * * *
Based upon the findings of fact as found by the Deputy Commissioner and adopted by the Full Commission, the Full Commission find as follows:
CONCLUSIONS OF LAW
1. On January 18, 1994, plaintiff sustained an injury by accident arising out of and in the course of his employment with the defendant-employer in that he sustained a right knee injury as a result of an accident of the work assigned. N.C. Gen. Stat. § 97-2(6).
2. It is well established that the Industrial Commission is the sole judge of credibility and weight to be given the testimony at hearing, and may accept or reject any or all of the testimony of a witness. Blalock v. Roberts Co., 12 N.C. App. 499, 183 S.E.2d 827 (1971). Although the Full Commission has the power to review determinations made by its Deputy Commissioners on the credibility of witnesses, the hearing officer is the best judge of the credibility of witnesses because he is the firsthand observer of the witnesses whose testimony must be weighed and then accepted or rejected. Pollard v. Krispy Waffle # 1, 63 N.C. App. 354,304 S.E.2d 762 (1983). Finally, it is noted that the Industrial Commission has the duty and authority to resolve conflicts in the evidence. Cauble v. Macke Co., 78 N.C. App. 793, 338 S.E.2d 320
(1986).
3. Plaintiff is entitled to receive temporary total disability compensation at the rate of $280.53 for the period of time beginning January 19, 1994 through February 4, 1994 and the time period beginning February 22, 1994 through June 8, 1994. N.C. Gen. Stat. § 97-29.
4. The Industrial Commission does not have jurisdiction to hear wrongful discharge claims.
5. Plaintiff may elect to receive temporary partial disability payments at the rate of $213.95 for the period of time from June 9, 1994 and continuing barring a change of condition or a return to work full-time at his pre-injury earnings for up to three hundred (300) weeks beginning on January 18, 1994. N.C. Gen. Stat. § 97-30; N.C. Gen. Stat. § 97-31.
6. Plaintiff may, in the alternative, elect to receive permanent partial disability payments for thirty (30) weeks for the right knee injury at the compensation rate of $280.53 in lieu of receiving temporary partial compensation payments subsequent to June 8, 1994. N.C. Gen. Stat. § 97-30; N.C. Gen. Stat. § 97-31.
7. Defendants are entitled to deduct the entire unemployment compensation benefits received by plaintiff for the time period from February 22 to June 8, 1994 from the temporary total disability payments that the plaintiff is entitled. Defendants are entitled to deduct the unemployment compensation benefits received by the plaintiff for the time period beginning June 9, 1994 to the present and continuing for the temporary partial disability payments plaintiff may elect to receive to the extent that the sum of the unemployment benefits and the workers' compensation benefits per week exceed sixty-six and two-thirds (66 2/3) of plaintiff's average weekly wage of $420.77. Defendants are not entitled to receive credit for unemployment benefits received by the plaintiff from June 9, 1994 to the present if plaintiff elects to receive permanent partial disability compensation for the injury to his right knee. N.C. Gen. Stat. § 97-42.1.
8. It is the undersigneds' understanding from plaintiff counsel's representations at oral argument before the Full Commission that plaintiff will elect to receive benefits pursuant to G.S. 97-30, in lieu of his G.S. 97-31 rating for permanent partial disability. Benefits will therefore be awarded in accord with his entitled election.
9. Plaintiff is entitled to have defendants provide all medical treatment arising from this injury by accident to the extent that it tends to effect, give relief or lessen plaintiff's disability. In particular, plaintiff is entitled to have defendants compensate the plaintiff for medical treatment for his right knee provided by East Chatham Medical Center, Inc. N.C. Gen. Stat. § 97-25.
* * * * * * * * * * *
Accordingly, the foregoing stipulations, findings of fact, and conclusions of law engender the following:
AWARD
1. Defendants shall pay temporary total disability compensation of $280.53 per week for the period of time beginning January 19 and through February 4, 1994 and for the time period February 22, 1994 and through June 8, 1994 less the amount of unemployment compensation received by plaintiff during this time period. This amount shall be paid in a lump sum subject to the attorney's fees awarded below.
2. Defendants shall pay plaintiff temporary partial disability payments at the rate of $213.95 per week for the period of time from June 9, 1995, and continuing barring a change of condition or a return to work full-time at his pre-injury earnings for up to three hundred (300) weeks (beginning on January 19, 1994) less the amount of unemployment compensation received by plaintiff during this time period. To the extent this amount has accrued, it shall be paid in a lump sum subject to the attorney's fees awarded below.
3. Defendants shall pay all medical expenses incurred by plaintiff as a result of his injury by accident on January 18, 1995 when bills for the same have been submitted to and approved by the Industrial Commission.
4. A reasonable attorney's fee of twenty-five percent (25%) of the compensation due plaintiff is hereby approved for plaintiff's counsel.
5. Of such amounts which have accrued, the twenty-five percent (25%) shall be deducted from sums due plaintiff and paid directly to plaintiff's counsel. Thereafter, every fourth check of temporary partial disability compensation due shall be paid directly to plaintiff's counsel.
This the __________ day of ________________________, 1996.
 S/ ______________________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S/ ______________________ LAURA K. MAVRETIC COMMISSIONER
S/ ______________________ J. RANDOLPH WARD COMMISSIONER
JHB/nwm